3769 from the Eastern District of Missouri, Daredevil v. ZTE Corporation. Mr. Dobbs. May it please the court. My name is Jay Dobbs and I represent Daredevil, Inc. in a claim that was dismissed by the I think the analysis missing in the court's opinion and, in fact, in the Ninth Circuit decision that was not exactly on point, but I see time and time again, is, well, let's back up on the necessary elements for claim preclusion are, of course, identity of the parties, identity, the quality of the person for and against who the claim is made, identity of the cause of action and identity of the things sued for. If they can't show any of those things, claim preclusion does not apply. And in this instance, there was an arbitration in which my client attempted to bring ZTE Corporation, which is a China organization organized under the People's Republic of China. And so it was absent from this arbitration and the arbitrator. Ultimately, there were claims and counterclaims. The arbitrator ultimately decided that neither party should take anything there. When the arbitrator decided that ZTE was not part of the arbitration, the underlying case was filed against ZTE Corp. And there was a stay in place that was lifted. There was a summary judgment motion that was then granted. Here, there's no identity of the parties. I mean, if you look at the party to the arbitration was ZTE Corporation's subsidiary, ZTE USA. And the district court and my opponents are saying that, well, their parents, so that's the end of the inquiry. We're done. They're in privity. They said they're functionally equivalent. However, I think if you follow your decisions in St. Jude and also in Albert versus Carter, you have to slow down and look at the facts and circumstances. And one of the questions that you ask is, well, why was the party absent? So ZTE China, it's true, it wasn't part of the arbitration. Is it because we failed to join them in the arbitration? No, it's because ZTE Corporation resisted the arbitration. Counsel, would you address the Ninth Circuit case that seemed to handle a companion case to this one involving the ZTE entities and concluded that there was privity between the parent and the subsidiary? Well, certainly, Your Honor. And in that case, there really was no analysis of privity beyond that there was a parent sub relationship. It was there's a parent sub relationship under Florida law or rather the parents are in privity with their subs. And so it was. Why is it wrong under Florida law? What Florida law says that's not sufficient to demonstrate privity? Well, this court applying Florida law and the cases requiring facts and circumstances to be considered for privity purposes. I mean, those cases that are cited by the defendants, they are cases in which there's a there's a wrongdoing by the sub for the very same wrongdoing and successive suits against. And that was the. Oh, I'm sorry. There was a there was a case you cited. I mean, those are those are cases that aren't applicable. And the reason is that my client intentional intentionally did business with ZTE China. My client is a telecommunications developer. They go to different cities. They bring a cellular network to each city. And there were cities that went ahead of the St. Louis market. And there was such a terrible experience with ZTE USA that when the representatives came to to Eric Steinman, who owns all of these, he said, I can't I can't deal with you. ZTE USA. I have to deal with ZTE China. And that resulted in that short agreement that we call the Missouri agreement. Everybody slapped a different label on it. But there's a short agreement and a master services agreement. And my client insisted that it do business with the Chinese company so that so that that the claims that we wish to bring here have to do with with that entity. And there I'm skipping kind of ahead. No, you're making sense. What I understood what happened. What I understood that happened at the arbitration is that the arbitrator addressed both the MSA and the Missouri agreement. They were considered together as essentially one arrangement. Well, that's what they say. And if I were on the other side, that's what I would say. But ZTE USA is just a sales arm of of the manufacturer and the company who actually manufactures the headsets, who actually decides what kind of inventory is going to be sent to ZTE USA, who actually decides who actually agreed to provide alternative dispute resolution that involve Chinese officials. OK, that's that's not ZTE USA. So and this is in our in our appendix towards the end of the appendix. All this is is laid out and it was before the court on summary judgment. And and that really and I have a longer list of that of things that the ZTE agreement does. But but the point is that claim has never been had. ZTE resisted with all ZTE core resisted with all its might inclusion in the arbitration proceeding. And there are so this this wasn't some like organic thing where it's like, well, all pending claims are going to be arbitrated. It was daredevils understanding that all claims, all claims, including pending claims. That's the word used in the stipulation. And those there are competing letters going back before the attorneys where they're arguing these points before the arbitrator. But it's clear that ZTE was unhappily surprised that I'm sorry, daredevil was unhappily surprised that ZTE Corporation said, hey, guess what? We're not part of this proceeding. We are actually we're not even going to participate in discovery. So we couldn't. Now, there are a lot of cases saying discovery is not positive. OK, but but those aren't cases involving a company that's, you know, partly owned by the Chinese government and difficult to discover. So when they say we're not doing discovery in the private arbitration, it it put at least one hand, maybe both hands behind our back. We've never had our claim against ZTE Corp. So ZTE Corp got exactly what it wanted by virtue of a 16 page letter by Ms. Brezvanec, which which are, you know, artfully resisted with every fiber of the arbitration. And she even says we're not we're not related to ZTE USA. Counsel, if if in fact the the Missouri agreement and the MSA are one contract, as the Ninth Circuit has said, has concluded. Do are there separate claims against USA and Corp? So, yes, there are separate claims because there are duties that are independent that could only be performed by the Chinese company. So the parents and I don't I don't mean any disparagement by calling it a Chinese company. Just as a matter of fact, it is so. But so the master supply agreement was actually signed by ZTE. And it was kind of a it was signed on the same day. But in again, our in our declaration, our client explains their lawyer said, well, you know, we have these other MSAs and other markets. We need this boilerplate language in there, but it doesn't affect your agreement with ZTE USA. And one really important point with that is that the master agreement applied a limitation of liability section. Because there's no question that applied to ZTE USA. So when and probably the simplest example is, is, you know, whether or not ZTE USA delivered something. OK, so but but there's a they signed that master agreement. But this other agreement is separate to ZTE China. Now, you know, it's it's it's not fair. It's not fair to accomplish what you wanted, which is exclusion from the proceeding. And then turn around and say, oh, well, that's already been decided because it matters in this case. It really matters. And we have a long list of reasons that matters. That they were absent and it's not fair for them. And, you know, fairly, the law is not always fair. I'm not saying that that's the test for race judicata. But but it is in this case consistent with the principles that you all have discussed in in St. Jude and Ebert or Elbert and that you have to you have to slow down and look at the facts and circumstances. And if you do that here, you will conclude. That my client's entitled to sue ZTE Corp. On its agreement. And that's. Thank you. You're within your rebuttal time. You can continue. I think I'll be quiet now. Thank you. All right. Ms. Bezvinick. Yes, your honor. Get my camera on. Thank you, your honors. I want to start with what I think is obviously we're here asking the court to affirm Judge Sippel's grant of summary judgment on the basis of race judicata. And Judge Smith, as you noted, we're not riding on a clean slate here. Obviously, this court is its own court. It's not bound in any way by the Ninth Circuit. But as Judge Sippel noted, it is highly persuasive contract that was at issue in the Ninth Circuit case. And that was in which the Ninth Circuit held that race judicata barred the claim against ZTE Corp. Is, in fact, the exact same contract that's at issue in this case. It's the same organization. It's the same party. Not the same parties. In that instance, it was a sister company, Daredevil. These are a group of companies that are all do business under the ClearTalk brand that are managed by Mr. Steinman. This is a litigation that goes back to 2011, which is when the first case was filed in Florida. Cases that were filed by different subsidiaries in Florida, Missouri, South Carolina, Tennessee. Case against Mr. Steinman in California. All of these things were wound together. There was an arbitration provision in the agreements. They were brought together into a consolidated arbitration by the agreement of the parties, including Daredevil. All of those parties agreed that because of the relationship, as Mr. Dobbs alluded to, there are these related companies and the equipment was being moved from place to place. There were overlapping purchase orders. It was really one story. In fact, even counsel for the ClearTalk entities, these companies that include Daredevil, referred to it as a single transaction. It just went from state to state to state, but it all overlapped. The parties had a consolidated arbitration. There were entity claims, which were initially, again, CTUSA only. At the time that the arbitration was consolidated, those were the claims that were pending. At that time, there was one claim pending by Mr. Steinman only. USA and the parent company Corp. It had to do with an individual guarantee he had given where he claimed he was due money back. So ZT Corp. became part of the arbitration, but solely for that purpose. The debate in the arbitration was whether the consolidation was brought or not. The arbitrator concluded that it was not. Now, having concluded that it was not, at that point, the various ClearTalk entities proceeded to file separate claims across the country against ZT Corporation, including here in Missouri. Now, at that time, ZT Corp. moved to stay those various actions. And courts across the country stayed the actions against ZT Corp. pending the determination being made in the arbitration. Why did they do that? All of those courts, including the Missouri court, did that on a discretionary basis, not required by the arbitration act, but on a discretionary basis. Because they believed and saw, based on the allegations of the pleadings, that the claims against ZT Corp. and the claims against CTUSA were, in fact, the same. And, Your Honor, in the appendix, and I think this really addresses this issue of, and the question that I believe Judge Kelly asked, which is, is the claim against ZT Corporation really different from the claim against CTUSA? And it isn't. And it isn't because of the way the claim against ZT USA was tried and alleged and the way the claim against ZT Corporation is alleged here. In the appendix at page 67 is the first amendment complaint in this case. And in the appendix at page 81 are the relevant excerpts of the statement of claim from the arbitration having to do with the Missouri allegations. They are almost verbatim. The allegations against ZT USA are the same as the allegations against ZT Corporation. They concern the obligations that Mr. Dobbs was talking about that he indicated were somehow unique to ZT Corporation. All of those allegations were, in fact, tried in the arbitration. And we know that because we can see the discussion of it in the final award that was issued by the arbitrator, a former Florida Supreme Court justice. And that final award is at page 98 of the appendix. And there are specific discussions about all of these things. The alleged failure to provide handsets. The alleged failure to timely deliver equipment. The alleged failure to participate in a joint venture. The alleged harm that because of ZT's conduct that somehow daredevil was precluded from going forward with its business plans in the Missouri marketplace. Instead, what the evidence showed and what the arbitrator found, and this is why these are the same claims. What the arbitrator found was the evidence was that you made a decision to leave the Missouri marketplace on your own. You didn't lose the race to market because equipment was delivered to you late. The evidence showed that your competitor got there before you even purchased the equipment from ZT. So these are all claims. The failure to deliver. The impact on daredevil. The handsets. The joint venture. All of which were addressed in full in the arbitration. Because to Judge Kelly's question, the Missouri agreement consists of these agreements put together. They're signed the same day. And by their terms, the first page says the terms of the attached agreement will apply and are in effect between ZTE and daredevil. And the last sentence of the agreement, that agreement says additional terms as included. And then there is the Missouri MSA, which is attached. Now, in its initial brief, daredevil tried to suggest that the arbitration award was limited to the Missouri MSA. That is the master supply agreement. But there's terms and conditions. I think of it sort of like the back of an invoice. So those are the terms and conditions. And then sort of the deal terms are in this first agreement. And the two are attached and they make one agreement. The words from the arbitration were this is counsel for daredevil speaking at the arbitration. They were all done together. Everybody testified to that. And it was all to be interpreted as one integrated document. And that document, which is the nomenclature that was used by the parties during the arbitration and that the arbitrator used in his award. And that applied consistently throughout was the Missouri MSA. Because there was a Florida agreement as well. There was a Florida MSA. So to distinguish it, one was called the Missouri MSA. One was called the Florida MSA. We ended up dealing with five different jurisdictions. Claims from Tennessee. Claims from South Carolina. Claims from Florida. Claims from California. Claims from Washington. Which was the claims that wound up being the subject of the Ninth Circuit's opinion in NTCH versus Washington. So these were, in fact, and the allegations of these pleadings make it very clear that this is not a close question. These are exactly the same claims. Although the briefs hypothesize potentially different claims against CT Corporation, that's not what we see in the record. They are the identical claims. Because in the arbitration, the things that Daredevil is now trying to suggest it should sue CT Corporation for, that was the subject of the arbitration against CT USA. There is no question it's alleged, and it's in the record, that CT USA is the U.S. subsidiary of CT Corporation. Under Florida law, as Judge Smith noted, that puts the parties in privity. They were sued in the same capacity as corporate entities. The claims are identical based on the pleadings that appear in the record. Those are the identities for purposes of the application of race judicata here. Whether the claims are the same turns on whether they are the same facts and evidence as a matter of Florida law. And it is clear based on the record that they are. Really, I think there are four documents that I would respectfully direct the court to. The complaint, the statement of claim in arbitration, the final award, and the last thing would really be the claimant's closing submission in the arbitration. In which we see the arguments that were made against CT USA in arbitration for liability. And they are the same arguments that are being asserted based on the same facts and evidence that we see against CT Corporation here. And that is why, respectfully, we believe, Your Honor, that the Washington court and the Ninth Circuit reached the conclusion that it did, and that Judge Sippel reached the conclusion that he did. The last issue really is this question of choice of law. I don't think that's really debatable. Florida law governs here. Florida race judicata law governs here based on this court's decision in St. Jude. And also based on the legion of Eighth Circuit cases that we've cited in our brief. And the underlying Supreme Court cases of Taylor and Semtec, which hold that where a judgment is rendered in diversity, that the state law of the rendering court applies. And in this instance, that was Florida. And that was based on diversity jurisdiction in the Middle District of Florida. Your Honors, I would just end by saying this. This fight has been going on since April of 2011. ZTUSA went through arbitration. It had to fight to get that arbitration award confirmed. And it was subsequently affirmed at the Eleventh Circuit. Another part of that award against Mr. Steinman, it had to fight to get that award confirmed. That was confirmed in the Central District of California and affirmed by the Ninth Circuit. The cases against ZT Corporation in South Carolina and in Tennessee, those were won by ZT Corporation based on a lack of personal jurisdiction. Those were affirmed by the Fourth Circuit and the Sixth Circuit. The case in Washington, the court determined, as Judge Sibel did here, that the case against ZT Corp was barred by race judicata. And the Ninth Circuit affirmed it. This is the last of the pending cases from this journey that we've been on since 2011. We would respectfully request that this court affirm Judge Sibel's recent grant of summary judgment and that we bring this to a conclusion. Thank you. Thank you, Ms. Bisvinik. Mr. Dobbs? You're muted. Your mic's muted. Sorry. Can you hear me now? Yes. No pun intended, since we're dealing with a cell phone. Your Honor, so I would also point the court to Appendix 176. Which is Ms. Bresnick's own words about why ZTE should not be a part of this action. So it's easy to say we won and the issues were straightforward when the party that we contracted with for those essential duties, which is unique to the Missouri market, okay? So that's something that shouldn't get lost here, is that because of the bad experiences in the other markets, we demanded to deal with China. And we never got that opportunity in the arbitration. And so was ZTE a party to this agreement or not? Because the terms and conditions, the MSA, the ZTE sign, not the Missouri agreement, but the MSA, had an arbitration provision. But yet ZTE Corp's position was we've never agreed to arbitration. It's saying it's not part of that agreement. The other thing about the pending claims issue is there was a claim brought after the fact and not objected to by Washington, the Washington entity. Also ZTE USA brought a counterclaim. That was an appending claim. So this is orchestrated to exclude ZTE. And there are really important issues like to prove this claim, we need to have access to the engineers. We need to have access to those things that who are employed by the China company in China. There's a dispute resolution provision with those Chinese officials. And I'm running out of time. But I ask you to look carefully at that issue. It requires the China company's involvement. And this was unfair to have their absence. In the arbitration, I would ask the district court to remand the case back to the district, to reverse the judgment and send it back to the district court, to have our first day in court on this agreement against the Missouri company. Or against ZTE Corp, rather. Thank you. Thank you, Mr. Dobbs. Thank you, Mr. Dobbs. Thank you also, Ms. Vinnick. The court appreciates both counsel's presence before us today in providing argument in supplementation to the briefing that you submitted. We'll take the case under advisement, render decision in due course. Thank you.